Ex. A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 05-21113-CV-JORDAN
Magistrate Judge Brown

SLIP-N-SLIDE RECORDS, INC.,

Plaintiff,

vs.

TVT RECORDS, LLC,

Defendant.
_______________________________/

TEEVEE TOONS, INC.,

Counterclaimant,

v.

SLIP-N-SLIDE RECORDS, INC.,et al.

Counter-Defendants.
_______________________________/

**REPORT AND RECOMMENDATION**

This cause is before the Court on the Plaintiff's Emergency Motion for Preliminary Injunction, filed July 8, 2005, and on Counterclaimant's Emergency Motion for Preliminary Injunction, filed July 18, 2005. The Court has reviewed the Motions, the Responses, Counterclaimant's Reply, and all other pertinent portions of the file. In addition, an evidentiary hearing was held on August 30, August 31, and September 7, 2005. The Court adopts the transcript of the hearing by reference herein.

**Procedural Facts**

On March 28, 2005, Plaintiff Slip-N-Slide Records, Inc. ("S-N-S"), a record producer and distributor filed a three count complaint in the Circuit Court for Miami-Dade County, Florida alleging Tortious Interference With Advantageous Business Relationships (Count I) and seeking Declaratory Relief (Count II) and Count III (Temporary and Permanent Injunctive Relief), in connection with the release and distribution of a record album entitled "Welcome to the 305." That action was subsequently removed to this Court. On April 29, 2005, Defendant/Counterclaimant TeeVee Toons, Inc., d/b/a TVT Records ("TVT") filed a counterclaim against S-N-S, as well as Rudebwoy Entertainment ("Rudebwoy"), 305 Music, and other unnamed Counter-Defendants, alleging Federal Trademark Infringement in Violation of 15 U.S.C. §1125(a) (Count I), and False Designation of Origin and False Advertising in Violation of 15 U.S.C. § 1125(a) (Count II).

**FACTS**

**"Welcome to the 305" and "M.I.A.M.I."**

On September 1, 2001, Armando Perez, a recording artist professionally known as "Pitbull," ("Pitbull") entered into a recording contract with producer Julian Boothe ("Boothe"), President of Rudebwoy ("the Boothe contract"). That contract gave Boothe exclusive copyright ownership as to the master recordings made under the agreement, which were to be deemed "works made for hire." Ex. 3, ¶7.[1] The contract also provided that Boothe could use Pitbull's name, likeness, photographs and biographical information in connection with publicizing the Boothe Masters. ¶7b.

In 2001, pursuant to the Boothe contract, Pitbull made recordings (the "Boothe Masters"),

---

[1]Pitbull's first contract, under which he recorded some songs, was with Luke Records, owned by Luther Campbell. That contract expired prior to the Boothe contract.

at least portions of which were later used in the recording of "Welcome to the 305," ("305"). In order to market and distribute 305, Boothe entered into distribution contracts with 305 Music, Inc. and Plaintiff S-N-S. On March 1, 2002, Pitbull executed a release (Ex. 4) which again acknowledged Boothe's exclusive rights to the Boothe Masters.[2]

In October 2003, Pitbull, through his agent The Diaz Brothers Music Group, Inc. ("DBMG") entered into an agreement with TVT ("the TVT contract," dated October 23, 2003), which provided that Pitbull would furnish exclusive recording services to TVT. The TVT contract further provided as follows:

> 5. (a) You warrant and represent that you have the right to enter this agreement and Exhibit "A" annexed hereto and made a part hereof, and to grant the rights provided for hereunder and fully perform hereunder. You warrant and represent that all materials delivered hereunder will not infringe upon any and all rights of any other parties. You will cause Artist to execute the Artist Inducement Agreement annexed hereto and made a part hereof as Exhibit "B". <u>You and Artist hereby assign to us in perpetuity and will deliver to us hereunder all demonstration recordings, all masters and recordings embodying Artist's performances recorded prior to the date hereof and not heretofore commercially released.</u> <u>All creative decisions (including, without limitation, selection of songs, producers, mixers, studios and creative personnel including, without limitation, guests artists) regarding the masters subject hereto will be subject to your and our mutual approval.</u> All masters will be technically and commercially satisfactory to us. You indemnify us and all parties deriving rights from us from any liability, including, without limitation, reasonable legal costs, connected with any claim inconsistent with any of the warranties or representations made by you hereunder. (emphasis added).
>
> * * *
>
> (c) All other terms and conditions where not inconsistent with the terms hereof will be set forth in our standard exclusive "long form" recording agreement attached hereto as Exhibit "A", it being agreed that in the event of

---

[2] Also in 2002, Pitbull Productions (not a party to this suit) filed a trademark application in the entertainment services class for the name "Pitbull," which was granted on August 2, 2005.

> any inconsistency, this agreement will take precedence over said "long-form" agreement; provided, however, that the parties hereto agree that promptly following execution of this agreement they will engage in good faith negotiations with regard to changes to the (nonsubstantive) terms of said Exhibit "A" to the extent such changes would not be inconsistent with the terms of this agreement; in the event that said standard agreement is not fully executed within six months from the date hereof, then "Exhibit "A" shall be deemed to have been fully executed and no further negotiations to said document shall take place unless such failure to execute is not by reason of your actions or omissions. ...

Ex. 13, ¶¶ 5(a), (c).

Jacqueline Sussman, Vice President of Business and Legal Affairs for TVT, testified that the "TVT Exclusive Recording Artist" agreement which is attached to Exhibit 13 is the "long form" agreement which became "Exhibit A," to the TVT contract, and which provides, inter alia:

> 5.01 All Master Recordings and all Audio-Visual Recordings Delivered hereunder or recorded by Artist during the Term[3] and the performances contained thereon and Recordings derived therefrom shall from inception of their creation be entirely the property of TVT in perpetuity throughout the universe, free of any claim whatsoever by you or any other Persons and will be considered "works for hire" made for TVT for purposes of the United States Copyright Law, and TVT shall have the right to register the copyright in such Master Recordings and Audio-Visual Recordings in TVT's name ...
>
> * * *
>
> 5.04 TVT shall have the perpetual right, which right shall be exclusive during the Term, without any liability to any Person, to use and to authorize other Persons to use the names (including any professional names or sobriquets), approved likenesses (including pictures, portraits and caricatures), and approved biographical material of or relating to you and Artist, ..., for purposes of advertising and promotion in connection with the making and exploitation of Records hereunder and in TVT's general goodwill advertising. You warrant and represent that you have the exclusive right to so use and authorize the use of such names, likenesses and biographical material and that the use of same will not infringe upon the rights of any Person. ... (emphasis

[3]Defined "to begin on the date hereof and continue, unless extended as provided herein, for a first Contract Period (sometimes referred to as the 'Initial Period') ending twelve (12) months after the Release Date for such Contract Period." ¶1.01.

added).

* * *

> 10.04 During the Term, subject to the foregoing provisions of this paragraph 10, Artist's recording services will be rendered exclusively to TVT. During the "Restriction Period," neither Artist nor you or any other member of Artist will perform for (nor will you or any other member of Artist license, consent to, or permit the use by any Person other than TVT of your or Artist's performances for or in connection with) the recording or exploitation of any Phonograph Record ... As used herein, "Restriction Period" means the period commencing on the date hereof and continuing until the later of the date five (5) years subsequent to the initial date of release of the Master Recording embodying the applicable Composition hereunder, or the date two (2) years subsequent to the expiration or termination of the Term. (emphasis added).

* * *

> 10.08 Neither you nor Artist shall authorize or knowingly permit the Artist's instrumental and/or vocal performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Phonograph Records or Audio-Visual Devices in violation of the restrictions herein, and you and Artist shall take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than TVT of such Phonograph Records. ... Subject to the foregoing provisions of this paragraph 10, neither you, Artist, nor any person deriving any rights from you or Artist, shall use or authorize or permit any Person other than TVT to use Artist's name (including any professional name or sobriquet), likeness (including picture, portrait or caricature) or biography in connection with the manufacture and/or exploitation of Master Recordings or Records (including Audio-Visual Devices). (emphasis added).

Ex. 13. Exhibit B, the Artist Inducement Agreement, was also signed by Pitbull.

Pursuant to this agreement, on August 24, 2004, TVT released Pitbull's debut album, entitled "M.I.A.M.I." It contains twelve tracks with Pitbull and other featured artists, and although Pitbull wrote all of the songs, other writers are also credited. The cover of the album contains a photograph of Pitbull, wearing a black shirt and a green fatigue colored cap with "305" on the front. TVT's art director created also created a logo for the cover, which was the name "Pitbull" in a stylized format (essentially Old English font with a stylized "P") (See Ex. 34) ("TVT's Pitbull logo"). TVT's

Pitbull logo was used in connection with its promotion and advertising of M.I.A.M.I. and Pitbull's recordings as a TVT artist (Ex. 15), with TVT investing close to four million dollars in the project. Sales of the M.I.A.M.I. album achieved "gold" status.

The June 2004 edition of OZone magazine contained an article about Pitbull and the release of M.I.A.M.I., and features on the cover a photograph of Pitbull wearing a striped shirt with the words "HABANA CUBA." (Ex. 19).

**The Allegedly Infringing Conduct**

Sometime after there had been substantial sales of M.I.A.M.I, S-N-S began advertising and marketing for the release of 305, which contains some of the Boothe Masters. That album, which has not yet been released, also includes instrumental tracks, vocal tracks from other artists, and "skits," or short conversational recordings. Pitbull performs to some extent on every musical track, although he does not appear on the skits.

S-N-S placed an advertisement for 305 which describes it as containing "Never Heard Previously Unreleased Material" from Pitbull and includes the titles of some of the tracks, as well as the names of featured artists. (Ex. 16). The ad also contains TVT's Pitbull logo and a photograph of Pitbull, which is similar, although not identical to, the photograph of Pitbull which appeared on the OZone Magazine cover, in that he is wearing the same clothing but has a different pose. Mr. Boothe testified that he obtained this photograph from a photographer.[4]

The cover art created for 305 (Ex. 7) includes a photograph of Pitbull, again in the same clothes but a third pose. It also contains a Pitbull logo which is similar but not identical to TVT's Pitbull logo, in that all letters, including the "P" are in Old English font (as opposed to the stylized

---

[4]It is undisputed that TVT does not own either of the photographs.

"P"). Mr. Boothe testified that the graphic designer suggested this design after stating that "people are familiar" with the TVT Pitbull logo. There is no indication on the cover as to the date when Pitbull recorded his songs, or that the songs are based on prior unreleased recordings.[5]

S-N-S also issued a promotional "one sheet" for 305 (Ex. 17), which contains the same photograph as contained in the ad, and the Pitbull logo that is contained on the album cover and states, inter alia:

> Pitbull's current album "M.I.A.M.I." is one of the top selling albums in the country. This Pitbull special edition called "Welcome to the 305" is finally becoming available for the first time. This rare collection of songs was recorded when Pitbull first started in the rap game. The biggest producers in the Hip Hop game helped in reproducing this album. ...
>
> Pibtull has made a name for himself with hard work, catchy songs, and street creditability [sic]. The full-length album is something has [sic] fans have been waiting for and it's perfect timing when he's on top of his career.
>
> The young 23 Cuban-American has dominated the charts with hit songs collaborating with Lil Jon, Ying Yang Twins[,] Daddy Yankee, Nina Sky, and many others. Now with this collection of songs that has never been released before, fans will get a chance to catch him in rare form.

Ex. 17. The one-sheet also refers to M.I.A.M.I. by stating: "Top Selling Independent artist of 2004 with his current album still selling strongly weekly" and "Album sales for Pitbull's Debut album 'M.I.A.M.I.[']surpass 300,000 copies as Pitbull prepares Video for next bilingual single 'Toma,' the

---

[5]The copy of the 305 CD that was entered into evidence contains a sticker which states:

ALBUM INCLUDES
TRINA, LOST TRIBES
DUECE POPPI, PLIES, CUBO
I.R.S., & TRIVALES

S-N-S proffered at the hearing that it would also be willing to place on the 305 CDs a label which states that it contains previously unreleased material.

follow-up to his breakthrough hit 'Culo'." Ex. 17.

**The Cease and Desist Letter**

Ms. Sussman, after seeing the advertisement and one-sheet for 305 sometime prior to March, 2005, and noting that the TVT contract did not contain a schedule of "previously unreleased masters," contacted Angela Martinez, Esq., President and Director of Pitbull Productions, who told her that 305 contained old songs Pitbull had recorded for Boothe. On March 2, 2005 Ms. Sussman wrote a letter to the attorneys for Pitbull Productions and DBMG demanding that 305 not be released, that they refrain from using Pitbull's name, likeness and biography in connection with 305, and further demanding an assignment of the previous unreleased masters. (Ex. 43).[6]

Ms. Sussman also spoke with Alan Jacobi, Esq., who called her on or about March 22, 2005, stating that he represented one of the investors in 305.[7] According to Ms. Sussman, Mr. Jacobi said that he was "a little skeptical" when Mr. Lucas told him "that he had found these masters," but that 305 was going to be released and referenced a "monetary buyout." Ms. Sussman testified that she called Mr. Jacobi several days later and requested a copy of the CD but he said that there were no "finished goods" and that he would see what he could get. Mr. Jacobi countered this testimony by testifying that in this phone call, he asked Ms. Sussman what TVT's position was regarding the release of the album, and told her that there should not be a problem, because the Boothe contract gave S-N-S the right to release the album in any manner it sees fit and to alter and amend it.

---

[6]Ms. Sussman stated that she was not aware of any "due diligence" done at the time the TVT contract was signed to confirm that the representation by DBMG and Pitbull that there were no previously unreleased masters was truthful. Theodore "Ted" Lucas, President of S-N-S,testified that five or six different companies have previously unreleased masters from Pitbull, and noted that TVT's website refers to one with Luther Campbell.

[7]Mr. Jacobi, who is president of Pyramid Records, also acted as Plaintiff's expert witness at this hearing.

On March 28, 2005, Ms. Sussman, on behalf of TVT, sent out Cease and Desist letters (the "Letter" or "Letters"), possibly one hundred in number, to numerous distributors, including Alternative Distribution Alliance, Inc., ("ADA"), the intended distributor of 305, with whom S-N-S had a non-terminable contract, stating inter alia:

> To Whom It May Concern:
>
> This notice is sent on behalf of TVT Records ("TVT"). Be advised that the artist professionally known as "Pitbull" is under exclusive contract to TVT, and that TVT has invested substantial sums developing the brand and trademark associated with "Pitbull." The album known as "Welcome to the 305," currently being advertised for release by Slip-N-Slide Records, has been compiled and is being promoted without TVT's authorization and is in violation of TVT's rights.
>
> You are hereby notified that:
>
> 1. The sale, placement, distribution, marketing, advertisement and/or promotion of the "Welcome to the 305" album violates TVT's rights and constitutes, without limitation, violation of the Lanham Act.
>
> 2. TVT will enforce all of its rights and will seek redress for any violation of those rights, to the fullest extent of the law.

Ex. 2. Ms. Sussman testified that at the time she wrote the Letters, she had not heard 305 or seen the cover and had not seen any messages regarding 305 on any websites.

On April 28, 2005, TVT filed a trademark application for the TVT Pitbull logo for use in "musical sound recordings and musical video recordings by the recording artist with the same name." Ex. 9.[8]

---

[8] On June 29, 2005, an attorney on behalf of Pitbull Productions wrote a cease and desist letter to TVT regarding this application. Ex. 8.

**Effect of the Letters**

Ted Lucas, President of S-N-S, testified that he had received 103,000 pre-orders, totaling over $800,000 copies of 305 before the Letters were received by the distributors. According to Mr. Lucas, he was originally going to release 305 in April, 2005 and agreed to change it to May at the request of TVT, but was unable to release it in May because virtually every distributor who received the Letters refused to sell it. Mr. Lucas testified that he believes he could have sold at least 500,000 additional albums, but admitted this was speculative. He further testified that he must release 305 now, in order to take advantage of the holiday season, and because 305 follows the style of the M.I.A.M.I. album. He has already spent about $200,000 marketing 305.[9]

To counter this testimony regarding the planned release date of 305, TVT submitted the deposition testimony of Rafael Artero, vice president of BMG Music Publishing, which has a publishing agreement with Pitbull. Mr. Artero testified that he received a letter dated Jan. 27, 2005 from Boothe requesting permission to use the derivative works of songs written by Pitbull. Ex. 12. Mr. Artero unsuccessfully tried to reach Pitbull, who was out of the country. Sometime later that week Boothe brought the songs to the office and said that the splits that he was providing had been negotiated between the writers of the songs. Mr. Artero signed the letter, accepting the amounts that Boothe had calculated, and when Pitbull returned from Europe, Artero advised Pitbull of the approval. However, Mr. Artero testified that he advised Boothe that he should also have a mechanical license issued through Harry Fox Agency. Mr. Artero testified that as of the date of the deposition (August 29, 2005) Harry Fox Agency had not issued any mechanical licenses for Pitbull's

[9]Mr. Boothe testified that he personally has invested approximately $30,000.

interests in the songs on 305.

Mr. Boothe testified that at the time he received approval from BMG Music, he understood that he would be required to get a mechanical license through the Harry Fox Agency for Pitbull's share of the composition, and that the licenses issued by the Harry Fox Agency dated August 15, 2005 (Ex. 44) identify Pitbull as one of the co-authors of each of the tracks embodied on 305. Ex. 44. He additionally testified that it was his belief that based on the Boothe contract, he had the rights to use derivative works with respect to the Boothe Masters under the copyright act, and that he has all of the contracts and permissions necessary in order to release 305.

**MediaPal website**

From approximately the end of May through mid-August, 2005 a website called MediaPal allowed customers to download 305 for a fee, on a web page called "Welcome to the 305." (Ex. 21). The website describes 305 as "the new album from Pitbull" and Pitbull's "next project," and contains photographs which were commissioned by TVT and were taken during TVT's filming of a video for the single "Toma" from the M.I.A.M.I. album.

Mr. Lucas testified that MediaPal is a website run by a fan of Pitbull, Brian Lenett, who approached Mr. Lucas about the rights to download the album. Although he acknowledged giving Mr. Lenett a 305 CD and receiving Exhibit 40 (a May 25, 2005 email which refers to what the website "www.WelcomeToThe305.com" will offer, and provides how the sales proceeds would be shared), Mr. Lucas insisted that an agreement was never reached and that he has not received any money from this website.

Brian Lenett, who described himself as "founder" and "acting president" of MediaPal, testified by deposition that MediaPal represents about five hundred clients in the music industry.

He stated that usually content gets in the system by being uploaded by the content owner after going to the website. When a client signs up in this manner, it agrees to a "Terms of Use Agreement," which provides, among other things, that members are responsible for ensuring that the contents of the websites are in compliance with all applicable laws, that members will not post content or sell a product that infringes the rights of third parties, and that the performance of its obligations under the agreement do not conflict with any other agreement or arrangement by which the party is bound.

As an exception to the normal course discussed above, MediaPal created the content for the "Welcome to the 305" after Lenett met with Ted Lucas and others early in May, 2005, subsequent to which MediaPal put its service on S-N-S's website to enable downloads of their content. After listing to a copy of 305 which Mr. Lucas had provided in mid to late May, Mr. Lenett purchased the domain name for the "Welcome to the 305" website and registered the domain on May 10, 2005, because he is "a big fan" of Pitbull and he decided that Mediapal would "start out and build" this website. Lenett depo. at 58. He stated that it also was a mutual benefit because the sales of the album "was going to reflect opportunity for both parties." Lenett depo. at 60.

MediaPal put up the 305 website in late May, 2005. Mr. Lenett testified that at some point Mr. Lucas agreed that it was a "good idea" and agreed to the terms of payment contained in the May 25, 2005 e-mail. However, Mr. Lenett also testified that between May 25 and the date the website was placed in the internet, he "didn't necessarily get approval, just let, you know, just let everyone know that it was up." Lenett depo. at 86-87. He further stated that the only feedback S-N-S ever gave on the website was "a short gesture saying it looks good ...." Lenett depo. at 113.[10]

---

[10]Mr. Lenett was unable to locate any e-mails that discussed the pricing of the downloads, other than the May 25 email discussed above, and could not recall if S-N-S gave approval to use the Slip N'Slide logo on the website. He also testified that he advised S-N-S that MediaPal was

None of the verbiage on the website came from anyone at S-N-S and there was no discussion with S-N-S regarding the approval of same. The portion of the site that says "'Welcome to the 305', the new album from Pitbull." was written by Bob Cohen (not proven to be associated in any way with S-N-S), who had no idea if 305 was previously unreleased or a follow-up. S-N-S did provide the photograph on the first page of the website because it was the photograph on the album cover, but none of the other photos came from S-N-S; rather, MediaPal took them off of the internet, believing they were in the public domain. All of the other content on the website was taken off of the internet. The website was taken down when MediaPal was served with the subpoena in this case on August 13, 2005.[11]

**305 - Quality and Public Reaction**

Raymond Seay, a sound engineer and mixer, testified by deposition that he worked on five of Pitbull's songs on M.I.A.M.I., two of Pitbull's songs on 305, a couple of other Pitbull singles, and approximately four songs in which Pitbull was featured.[12] With respect to the two songs on 305 ("Crank up the Dunk" and "Down South," on which Pitbull sang two verses), he received already recorded vocals from Pitbull, which he described as "poor," but then worked on making them sound

---

capable of sending a physical CD to a customer, but they did not respond, thatS-N-S did not agree to the "Terms of Use Agreement,"and that MediaPal did not requested permission from S-N-S for the 305 site to be included on the portion of the MediaPal website called "MediaPal in action."

[11]Ex. 21 to the deposition is a record of all of the 305 albums sales that have been downloaded at the 305 website.

[12]Mr. Seay has been in the music business for 17 years and is known as one of the best in the industry. He attended Full Sail, a technical school in Orlando, where he studied all aspects of production, copyright law and matters of contract law in the music industry, and was also exposed to some of the business aspects of the music business when he worked for Steve Shiffo, who has produced hundreds of records.

better by using some compression and "some EQ to make sure all the vocals matched." Seay depo. p. 57. Mr. Seay described this as "routine" and "tools of the trade," and agreed that it happens on virtually every record that is released in the music industry. Seay depo. pp. 90-91. Mr. Seay did not communicate with Pitbull during the production process of 305, which he said was not unusual, but did interact with Pitbull a lot on M.I.A.M.I. because it was produced by Lil Jon, who worked a lot with Pitbull.

Mr. Seay testified that he has never heard any negative comments about 305. Seven out of thirteen tracks (ignoring the intro and outro), or approximately 50%, had featured performers, most of whom he was not familiar with at the time, as opposed to M.I.A.M.I., on which 75% of the tracks had featured performers who were more well known. Mr. Seay stated that featured performers are commonly used to enhance an album, and that the prominence of the Pitbull name on the cover of 305 would make it appear that Pitbull is featured on every track.

Mr. Seay agreed that if Boothe owned the recordings made pursuant to a contract with Pitbull and the contract calls for Boothe to own the copyright, then Boothe can change the recordings. He also agreed that it is common for a company to have unreleased masters and that sometimes those songs get released when the artist moves to another company. He stated that he was aware that Pitbull was formerly signed to Luke Records, and that it is "common knowledge" that Pitbull has released mix tapes. Seay depo. p. 86.

Plaintiff's expert, Mr. Jacobi, testified that in his opinion, 305 is "a Pitbull record" because Pitbull performs on every musical track, although he does not appear on the "skits." Both Mr. Jacobi and Mr. Boothe testified that 305 and M.I.A.M.I. are the same genre, sound and quality.

An article in Rap News Network entitled "Meet Miami Native Pitbull" states, in part:

> Pitbull's first national project was in heavy rotation and he [sic] songs were heard in clubs around the country for months. The bilingual lyrics and well-produced tracks helped to spread his new Miami sound past the beaches and onto the national airways. All that said and done Pitbull must now prove that "M.I.A.M.I." wasn't a fluke. "Welcome To The 305" can either earn Pitbull a spot among rappers nationally or pigeon hole him as a regional rapper.

Ex. 25.

A message on the message board of the website "hiphopgalaxy.com" states:

> Not as good as MIAMI. Much more hip hop than latin hip hop like before. It's still good but far from Miami. Not a party album anymore.

Ex. 24.

Ms. Sussman testified that the M.I.A.M.I. album continues to sell, but she does not know if it is at the same rate as immediately following its release, and that TVT plans to release the next Pitbull album in the very near future.

## DISCUSSION

In order to be entitled to injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the moving party outweighs the harm an injunction may cause the non-moving party; and (4) that the injunction would not disserve the public interest. See e.g. American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998). A preliminary injunction is an extraordinary remedy that should only be granted when the movant has made a clear showing of its burden of proof. Café 207 v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993).

## I. PLAINTIFF'S CLAIM

### A. Likelihood of Success on the Merits

Plaintiff alleges that it is entitled to a preliminary injunction on the claim of tortious interference with a business relationship, and requests an order enjoining Defendants from interfering with the release and distribution of 305. The elements of the claim are: (1) the existence of a business relationship (2) defendant's knowledge of the relationship; (3) intentional and unjustified interference with the relationship by the defendant; and (4) damage to plaintiff as a result of the interference. See, e.g., KMS Restaurant Corp. v. Wendy's Intern., Inc., 361 F.3d 1321, 1325 (11th Cir. 2004). Because element (1) is clearly satisfied, the Court will address the remaining issues.

The Court first addresses the interference with the contract between S-N-S and ADA, which Mr. Lucas testified was a contract which was not terminable at will. With respect to the issue of justification, "so long as improper means are not employed, [footnote omitted] activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable." Ethyl Corp. v. Balter, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980). However, "the privilege to interfere in a contract because of a financial interest is not unlimited." Yoder v. Shell Oil Co., 405 So. 2d 743, 744 (2d DCA 1981). See McCurdy v. Collis, 508 So.2d 380, 384 (Fla. 1st DCA 1987) (stating that "the privilege [to interfere with a business relationship] does not encompass the purposeful causing of a breach of contract."); see also The Florida Bar Standard Jury Instructions Civil 85-1, 475 So.2d 682, 690 (Fla. 1985) (noting in Comments on Instruction MI 7.1 that in "the majority of cases where the issue to be determined is whether the defendant has intentionally interfered with a contract not terminable at will", "there is no 'justification' or 'privilege;' therefore if the interference is 'intentional,' it is likewise 'improper.'")

Although a non-terminable contract between S-N-S and ADA may have existed, Plaintiff has not shown that TVT had knowledge of that contract. Furthermore, as TVT points out, Plaintiff has not specifically pled interference with a non-terminable contract, but rather, has only plead the claim in terms of interference with a business relationship. The Court will therefore address the Letter sent to ADA in the same manner as the remaining Letters, using an interference with business relationship analysis.

As to the interference with S-N-S's business relationships with its distributors, TVT has a qualified privilege to interfere with the relationships to safeguard its own financial interests, as long as it did not do so by "improper" means. See Ethyl Corp., 386 So. 2d at 1225; see also KMS Restaurant Corp., 361 F.3d at1327. Improper means can include interfering by way of misrepresentations. See id. (citing Florida Standard Jury Instruction (Civil) MI 7.2.); Restatement (Second) of Torts §767, cmt. c. (1979) ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper. A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient ....").

The Letters sent to S-N-S's distributors stated, inter alia, that 305 "currently being advertised for release by Slip-N-Slide Records ... is in violation of TVT's rights," and that "[t]he sale, placement, distribution, marketing, advertisement and/or promotion of [305] violates TVT's rights and constitutes, without limitation, violation of the Lanham Act." Putting aside the question of any possible Lanham Act violation, which the Court will discuss further infra, TVT was aware that there was no contractual agreement between S-N-S and TVT. TVT further was aware at the time the Letters were written that the subject recordings were made for Boothe prior to TVT's agreement with

Pitbull. Considering Ms. Sussman's experience in the industry and her knowledge of how the "system" works, this at least raised the question of what rights Boothe had in the recordings. TVT's recognition of previously existing rights was also evidenced by Ms. Sussman's March 2, 2005 letter to attorneys for Pitbull Productions and DBMG demanding an assignment of the previous unreleased masters. Despite this knowledge, TVT made no effort to find out the extent of these rights prior to the issuance of the Letters, and at no time in this proceeding has TVT taken the position, much less supported it, that its contract with Pitbull extinguished any previously existing rights Boothe and/or S-N-S had in the Boothe Masters.

Therefore, TVT's statement that S-N-S's actions in promoting and distributing 305 were a violation of TVT's rights (under a contract with Pitbull) was a misrepresentation which was made with knowledge (or was at least reckless), and which was clearly intended to cause the recipients of the letters to not purchase 305.[13] Accordingly, the Court finds that TVT's interference with S-N-S's business relationships with its distributors was intentional and unjustified.[14]

The Court further finds that S-N-S has been damaged by the Letters. Mr. Lucas testified that despite having already received over 100,000 pre-orders of 305, he was unable to release the album in May because virtually every distributor who received the Letter refused to sell it. Although there was testimony on the issue of whether Mr. Boothe had obtained a mechanical license from the Harry

---

[13] Although TVT's contractual rights might have possibly been violated by Pitbull and or DBMG, they are not parties to these proceedings.

[14] The evidence showed that as time progressed, Ms. Sussman gained additional knowledge as to the packaging and contents of 305. However, none of this after- acquired knowledge makes the representation that TVT's rights were being violated (vis-a-vis S-N-S) any less of a misrepresentation. To the extent that TVT was referring to trademark rights, the Court finds, as explained below, that a statement that those rights were being violated was at least a reckless misrepresentation as well.

Fox Agency, it appears that licenses in some form were ultimately obtained (Ex. 44), and Boothe testified that as of the date of the hearing there was nothing preventing the release of 305 (other than the Letters). Moreover, there was no clear evidence offered as to what effect, if any, the failure to obtain any particular license had on S-N-S's ability to release 305 at an earlier date. Accordingly, Plaintiff has shown the requisite damage caused by the Letters, and a substantial likelihood of success on its claim against TVT for intentional interference with a business relationship.

**B. Remaining Factors**

The Court further finds that there is a threat of irreparable injury to S-N-S if an injunction is not granted, and that the threatened injury to S-N-S outweighs the harm an injunction may cause TVT. The Court accepts Mr. Lucas' testimony that he must release the album now in order to take advantage of the holiday sales period. As Mr. Lucas' testimony demonstrated, he is unable to pinpoint the amount of sales which he will lose if the album is not released, thus foreclosing a damage remedy.[15] The harm to S-N-S is not outweighed by that to TVT, which can pursue its contractual claim against Pitbull and DBMG, if appropriate, and as further discussed below, the current record fails to support TVT's claim that it will be damaged by the release of 305. Finally, the public interest will be served by allowing S-N-S to reap the benefit of its contractual agreement with Pitbull, and the Court's refusal to find that S-N-S's own contractual rights are snuffed out by a possible violation of a contract to which it was not a party.

---

[15] While it is true that Mr. Lucas testified to actual numbers of sales, it is clear from the record that these numbers were, at best, nothing more than hopes or guesses.

## II. COUNTERCLAIM

### A. Count I - Trademark Infringement

TVT maintains that the Counter-defendants have violated its trademark rights with respect to the TVT Pitbull logo. To establish a claim for trademark infringement, TVT must establish that the Counter-defendants "used the mark in commerce without its consent and 'that the unauthorized use was likely to deceive, cause confusion, or result in mistake.'" Nitro Leisure Products, L.L.C. v. Acushnet Co., 341 F.3d 1356, 1359 (11th Cir. 2003) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).

Counter-defendants respond that TVT does not have any underlying trademark rights to the name "Pitbull," in that the trade name "PITBULL" is owned by Pitbull Productions. See also TVT contract ¶ 10.01.2. Additionally, the TVT contract only grants to TVT a limited right to use Pitbull's trade name, and only in connection with the promotion and sale of recordings "Delivered" under the contract or recorded by Pitbull "during the Term" of the contract. ¶5.01. See also M& J Enterprises v. Outler, 717 So. 2d 620 (Fla. 3d DCA 1998) (citing the rule that "the name of an artist, [or] musician ... is not regarded as a trade name, and, as such, salable or assignable") (citing 74 Am.Jur.2d Trademarks and Tradenames §22 (1974)). The Counter-defendants likewise had contractual rights to use the Pitbull name in connection with the advertising and promotion of the Boothe Masters under the Boothe contract.

Seemingly recognizing this, TVT argues that "[i]n willful violation of TVT's rights, Counter-defendants have used the mark and Logo in interstate commerce not in connection with Perez's prior recordings delivered to Boothe, but, rather, in connection with new recordings featuring other artists, splicing in Perez's vocals." Reply p. 3. (emphasis added). The Court rejects the argument that 305

is a "new" recording, or not "a Pitbull recording." The evidence is uncontroverted that the vocals of Pitbull that are contained on 305 are the Boothe Masters that were recorded in 2001. Mr. Seay testified that the use of featured artists and mixing is very common, and Mr. Jacobi testified that Pitbull's voice is heard on every musical track and that this is "a Pitbull album." Although there was much testimony from TVT as to the amount of time (or lack thereof) that Pitbull's vocals are featured on 305, there was no evidence presented as to any accepted standard in the industry (if indeed such a standard exists) that is used to measure the amount of time that is necessary to make an album that of a particular artist, or in this case, a "Pitbull album."[16] The Court finds extremely significant (1) the fact that the artist himself is not a party to this lawsuit and (2) the lack of any evidence that he has expressed any negative feeling towards the release of 305. Compare Benson v. Paul Winley Record Sales Corp., 452 F. Supp. 516 (S.D.N.Y. 1978) (finding trademark violation where jazz musician George Benson sued over the release of album which contained old recordings of Benson which were altered and "over-dubbed" and was advertised as "XXX Rated new LP and single.")

As to the issue of whether TVT has any protectible rights in the stylized Pitbull logo it created for "M.I.A.M.I." and registered for trademark protection, TVT must show that the defendant's use of the mark (the name "Pitbull" in Old English font with a stylized "P") is likely to deceive or cause confusion. Nitro Leisure Products, 341 F.3d at 1359. In addition to the lack of evidence on deceit as discussed above, there is a lack of evidence of the likelihood of customer confusion between the two marks, which is analyzed using the following factors: (1) the type or strength of the mark; (2)

---

[16]TVT argues in its Reply that sec. 5.04 and 10.08 of its contract with Pitbull "protects TVT from the damage TVT would suffer from concurrent use of the Pitbull mark by others in connection with new Pitbull recordings." Reply p. 3. Although this may be true as between TVT and Pitbull, who is not a party to this lawsuit, it does not hold that Counter-defendants, who were not a party to that contract, have undertaken any such duty or responsibility towards TVT.

the similarity between the marks; (3) the similarity between the products; (4) the similarity of the parties' retail outlets and sales channels; (5) the similarity of advertising; (6) the Counter-defendant's intent; and (7) actual confusion. John H. Harland Co., v. Clarke Checks, Inc., 711 F.2d 966, 972 (11th Cir. 1985).

The Pitbull logo on the cover of 305 and any advertising or promotion which includes that particular logo is discernibly different from the TVT Pitbull logo due to the different type used for the prominent "P." Although S-N-S did use the TVT Pitbull logo in an advertisement, and factors (2) through (5) weigh in favor of TVT, TVT has failed to show the strength of the mark, which is analyzed using the same factors "that initially determine the mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning." Time, Inc. v. Petersen Pub. Co., L.L.C., 173 F.3d 113, 117 (2nd Cir. 1999). This distinguishes Coca-Cola Co. v. Gemini Rising, Inc., 346 F. Supp. 1183 (E.D.N.Y. 1972), cited by TVT, in that the defendant in that case conceded that the mark, which had been used in commerce for approximately 80 years and was readily associated with its owner was entitled to protection. Id. at 1188. The only evidence regarding the public's awareness of TVT's Pitbull mark was Boothe's testimony that his logo designer stated that people were "familiar" with the TVT Pitbull logo. There was no evidence, however, that the music industry or buying public associates the TVT Pitbull logo with TVT, as opposed to any other music label or producer, or with Pitbull himself.[17]

---

[17]To the extent that TVT attempts to rely on the Declaration of Steven Gottlieb in this regard, the Court never admitted that Declaration as substantive evidence. Furthermore, the statement made by Mr. Gottlieb, who is president of TVT and TVT Music, is without foundation and is obviously self-serving. Finally, the Court notes that because Counter-defendants changed the "P" for the 305 album cover logo such that it was different from the TVT logo and the prior ad that copied it, there is a lack of clear evidence that the Counter-defendants' intended to copy the TVT Pitbull logo, at least with respect to the logo that is now being used on the album cover.

Accordingly, the Court finds that TVT has failed to show a reasonable likelihood of success on its claim for trademark infringement.

### B. Count II - False Advertising/False designation of Origin

Similarly, in order to prove a claim for false designation of origin, TVT must establish that the Counter-defendants adopted a mark confusingly similar to TVT's mark such that there was a likelihood of confusion as to the origin of the goods. Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1503 (11th Cir. 1985); Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984) "The factors relevant to establishing this are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114." Ross, 765 F.2d at 1503-04. This claim fails for the reasons discussed above.

With respect to the claim for false advertising, TVT must prove the following:

> (1) the ads of the opposing party were false or misleading; (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions,(4) the misrepresented product or service affects interstate commerce, and (5) the movant has been – or is likely to be – injured as a result of the false advertising.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).

TVT argues that advertising for 305 was misleading on several fronts, including by making a claim that the recordings were "new," as opposed to previously recorded unreleased masters.[18] Even assuming that this representation would be false or misleading, the Court first finds no evidence

---

Even if customer confusion had been proven, TVT would be entitled to, at best, an order enjoining the further publication of the ad which reproduced the TVT logo, not the use of the Pitbull logo which is contained on the cover of 305.

[18]This argument, curiously, is the flip-side of the argument discussed supra, that the recordings were not "old," but were actually "new."

that the Counter-defendants advertised 305 as a "new" album or a "follow-up" album to MIAMI, or anything other then previously unreleased recordings. Rather, the only source which described the album as "new" and as "Pitbull's next project" was MediaPal. Viewed in a light most favorable to TVT, the testimony showed that there was some type of fledgling business relationship between MediaPal and S-N-S. There was insufficient evidence however as to any actual "agreement" or agency relationship on the part of MediaPal, and Mr. Lenett admitted that S-N-S had no role in creating the Welcome to the 305 website or the text contained therein.

Nor do the photographs of Pitbull which are displayed on the 305 cover and included in the advertisement and the one sheet infringe on any of TVT's rights or constitute false advertising in that (1) it is uncontested that TVT has no rights in the photographs themselves; (2) there is no evidence that the public associates those photographs specifically with the M.I.A.M.I. album or with TVT,[19] and (3) there is no evidence that Pitbull's "look" or "style" has changed in such a manner that it can be related to any particular "period" in his career. This third factor distinguishes this case from the case of Rich v. RCA Corp., 390 F. Supp. 530 (S.D.N. Y. 1975), which concerned a new recording with a "current" likeness of Charlie Rich on the front and back of the jacket, but which contained songs recorded by Rich ten to fourteen years earlier. In that case, the court noted that "[i]t appears from the affidavits and exhibits that Rich's singing style and appearance has undergone considerable change over the last ten years." Ms. Sussman testified that she is not aware of any change in appearance between the time the Boothe Masters were recorded and the release of M.I.A.M.I., and Mr. Boothe testified that Pitbull's look has not changed from that time to the present. There is also no competent evidence that Pitbull's singing style has changed. To the extent that TVT complains

[19]Indeed, the photographs used by S-N-S are very different from that contained on the M.IA.M.I. cover.

that the CD cover notes do not state the dates of Pitbull's recordings, Counter-defendants have proffered that they will place on the jacket a sticker which states that the CD contains previously unreleased masters.

Finally, even if TVT had proven that the public would be "confused" into thinking that this was a "Pitbull album" when it actually is not, that it was a "new" Pitbull album when it was not, or that it was a TVT album when it was not, there is no evidence that this will work to the detriment of TVT (i.e., that TVT will be irreparably harmed). The only evidence that the album will "disparage" Pitbull or his image (and therefore TVT's interests) is one posting to a message board suggesting that 305is "not as good" as M.I.A.M.I. and is not a "party album," in that writer's opinion. The Court finds this showing to be woefully inadequate.[20]

Accordingly, the Court finds that TVT has failed to establish a likelihood of success on the merits of its Counterclaim.[21]

## RECOMMENDATION

Accordingly, it is respectfully recommended as follows:

1. That Plaintiff's Emergency Motion for Preliminary Injunction be **GRANTED**, and that Defendant TVT be enjoined from interfering in any way with the distribution and/or release of "Welcome to the 305"; provided, however, that Plaintiff shall place on all copies of the CD a label

---

[20]The Court rejects TVT's suggestion that was unable to take discovery on these issues as of the time of the hearing. TVT was aware this was an issue when it filed its counterclaim on April 29, 2005 alleging the causes of action with respect to which it now seeks injunctive relief.

[21]Because the Court finds that TVT has failed to show a substantial likelihood of success on the merits and the possibility of irreparable harm, the Court need not address the remaining requirements for the granting of injunctive relief. The Court notes, however, that it finds that TVT has also failed to satisfy those elements.

which states "Contains Previously Unreleased Material."

2. That Counterclaimant's Emergency Motion for Preliminary Injunction be **DENIED**.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v.Dugger, 847 F.2d745 (11th Cir. 1988), cert.denied, 488 U.S. 958 (1988).

**DONE AND ORDERED** this 28th day of September, 2005 at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

cc: Honorable Adalberto Jordan
Richard C. Wolfe, Esq.
David M. Rogero, Esq.
Anthony N. Upshaw, Esq.
Peter L. Haviland, Esq.
Rhonda R. Trotter, Esq.